**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **ADELA J. CARRASCO; ERIC J. RAYA, KIERA T. MARTINEZ; ALEXANDER G. FLORES; ANNABEL LEIJA; BENJAMIN M. ONATE; MARIANNA C. PEREZ, individually and as the representative of minors S.O., L.O., J.F., J.C., and I.F; and MARLENI BRACCAMONTES,** | |
| **Plaintiffs,** | |
| **v.** | **No. 23 C 15572** |
| **CITY OF JOLIET, Joliet Police Officers A. ADAMS (Star No. 290); LAWRENCE BROOKS (Star No. 229); MICHAEL CAGLE (Star No. 129); FLOR DEL RIO (Star No. 210); PHILIP EMPH (Star No. 122); MICHAEL GEORGANTAS (Star No. 315); RAYMOND JANSMA (Star No. 167); PATRICK KELLY (Star No. 125); TIZOC LANDEROS (Star No. 88); BRADLEY McKEON (Star No. 296); SGT. MOORE (Star No. 43); RACHEL SMITHBERG (Star No. 320); RICHARD STYGAR (Star No. 61); MARCUS WIETTING (Star No. 245); COUNTY OF WILL; WILL COUNTY SHERIFF'S OFFICE; Will County Sheriff's Officers RUSS BURROUGHS (Star No. 2368); MICHAEL JANOVYAK (Star No. 2136); PAUL ROJEK (Star No. 1962); TODD WITTMAYER (Star No. 2112); U.S. Marshals Service Deputies DOMINIC DILUIGI and JUSTIN McCLOUD; Great Lakes Regional Fugitive Task Force Officers ALDO ALBA; ZACK SCHMITT; MIKE HARRINGTON; DAVE HAKIM; ERIC SLEDGE; PAUL McGINN; CHRIS STRUHART; and ERIC POWE;** | **Judge Rebecca R. Pallmeyer** |
| **Defendants.** | |

**MEMORANDUM OPINION AND ORDER**

On November 2, 2021, Plaintiffs—families living in two adjacent units, with members ranging from ages 10 months to 62 years old—awoke to find their Chicago home surrounded by

nearly thirty-eight officers from various state/local police departments and federal agencies. The law enforcement officers were attempting to execute a warrant for the arrest of a suspect, Elian Raya, who resided in one unit of the residential building at 226 South Comstock. But for reasons that are, at this stage, unclear, officers initially entered *228* South Comstock, the neighboring unit. In an aggressive raid, officers woke the residents, including small children; wielded guns; and cursed at them, turned over drawers, and ripped up couch cushions. Plaintiffs contend this conduct was intentional, and that officers deliberately entered the wrong unit to get information on a crime unrelated to the subject of the arrest warrant. When officers eventually entered 226 South Comstock about twenty minutes later, they found Elian, arrested him, and took him to the station for questioning. But the Plaintiffs were detained for nearly six hours in the living room of 226 while officers purportedly sought a search warrant to search the rest of the unit—all while denying Plaintiffs access to their medications, the bathrooms, and clothing.

Plaintiffs bring claims under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), alleging that the officers violated their constitutional rights. They also raise various state tort law claims against officers who were neither federal employees nor acting under color of federal law. Several of the individual Defendants—federal officers, officers from the Will County Sheriff's Office ("WCSO"), and officers from several other counties in Illinois—have moved to dismiss [156], arguing that their status as officers acting under color of federal law dooms Plaintiffs' claims against them. (*See generally* Mem. [157].) As explained below, the court concludes Plaintiffs have plausibly alleged that the WCSO Defendants and the officers from other counties were acting under color of state law, and declines to dismiss those Defendants at this stage. The court nevertheless finds that Plaintiffs have not adequately alleged that the federal officer defendants acted under color of state law, and grants the motion to dismiss as to those individuals without prejudice. Plaintiffs, who have now had the benefit of some discovery, have leave to file an amended complaint describing with specificity the involvement of the five federal officers in the operation.

## BACKGROUND

### I. Factual Background

The facts laid out below are taken from Plaintiffs' Second Amended Complaint ("SAC") [149], which the court must accept as true at the pleading stage. *See Ruiz v. Pritzker*, 162 F.4th 886, 889 (7th Cir. 2025). All reasonable inferences are drawn in favor of Plaintiffs. *Carter v. Cook Cnty. Sheriff*, 142 F.4th 897, 900 (7th Cir. 2025), *cert. denied sub nom. Carter v. Dart*, 146 S. Ct. 611, 223 L. Ed. 2d 228 (2025).

#### A. The Raid

On November 2, 2021, at around 6:25 a.m., Plaintiffs were asleep in two "adjacent-but-separate homes": 226 and 228 South Comstock Street in Joliet, Illinois. (SAC [149] ¶¶ 1, 5.) They were awakened by sounds of yelling and banging on the front door to 228 South Comstock. (*Id.* ¶ 1.) The building was surrounded by "nearly thirty-eight law enforcement officers" of the Joliet Police Department, Will County Sheriff's Office, U.S. Marshals Service, other federal agencies, and nearby Illinois counties. (*Id.* ¶¶ 1, 43.) The officers announced that they were from the U.S. Marshals and the Joliet Police department, and that they had an arrest warrant for an "Elliot Reyes." (*Id.* ¶¶ 1, 46.) From behind her front door, Plaintiff Adela Carrasco, a 62-year-old[1] disabled resident of 228 Comstock, told the officer she did not know anyone named Elliott Reyes and that no person of that name resided in her home. (*Id.*) In response, an officer told her that they would "break down the door if it was not opened immediately." (*Id.* ¶ 1.) Carrasco obliged and was confronted by "more than twelve rifles and handguns pointed directly at her chest and face." (*Id.*) Officers "continued pointing their firearms at her in a sustained fashion," though she "clearly posed no threat" to the officers. (*Id.*)

The officers did not have a warrant to enter 228 South Comstock. (*Id.* ¶ 2.) Rather, the officers had a warrant for the arrest, not of an Elliott Reyes, but instead for "Elian J. Raya," who

[1] Elsewhere in their complaint, Plaintiffs suggest Carrasco was 61 at the time. *Contrast* SAC [149] ¶ 1 (62 years), *with* ¶ 15 (61 years).

was listed on the warrant as residing in *226* South Comstock, the adjacent unit. (*Id.*) The application for the arrest warrant at issue had been filed by Defendant Raymond Jansma, a Joliet Police Department Detective, months earlier. (*Id.* ¶ 4.) Specifically, on August 17, 2021, Jansma sought a warrant for "Elian J. Raya," who was wanted "in connection with three weapons-related offenses." (*Id.* ¶ 34.) Jansma confirmed that Raya was "eighteen years old, was 5'8", weighed 170 pounds, and was last known to be living at '226 COMSTOCK ST' in Joliet, Illinois." (*Id.*) Later the same day, Jansma's warrant application was approved by a Will County Circuit Judge, but neither the Joliet Police Department nor any other law enforcement agency executed the arrest warrant for seventy-seven days after the judge signed off on it. (*Id.* ¶¶ 35–36.) Plaintiffs suspect that the warrant was not executed promptly because "Defendant Jansma did not actually think that Elian J. Raya had committed the three weapons-related offenses listed in the arrest warrant" and had applied for the warrant only to demonstrate due diligence after receiving a citizen complaint (on an unspecified date) from a known gang affiliate who claimed that Elian had fired a gun at his vehicle during a drive-by-shooting.[2] (*Id.* ¶ 37.)

As noted, the arrest warrant identified Elian Reyes' address as 226 South Comstock, but the officers instead entered the adjacent unit at 228 South Comstock—potentially the product of a careless mistake, but Plaintiffs do not see it this way. (*Id.* ¶¶ 3–4.) They allege that officers "were using the arrest warrant for Elian J. Raya in 226 as a false pretext to search 228." (*Id.* ¶ 4.) Plaintiff's allegations of an ulterior motive arise from events that had taken place two days before the search. (*Id.*) At an outdoor Halloween party earlier that week (the location of which is unclear from Plaintiffs' complaint), two 22-year-old individuals were fatally shot. The Joliet Police Department "faced enormous, mounting, public pressure to make an arrest for the crime," but,

---

[2] The court notes that while Plaintiffs asserts that Jansma had doubts regarding whether Elian committed the offenses listed on the warrant, Plaintiff also asserts that Jansma sought the warrant—representing to a judge under penalty of perjury that Jansma had probable cause to believe Elian *did* commit these offenses—several weeks before the Halloween shooting (discussed in greater detail below), and presumably before he had motive to fabricate charges against Elian.

stymied by the lack of investigative leads, Defendant Joliet Police Detective Raymond Jansma "revived a never-executed, 77-day-old warrant for the arrest of Elian J. Raya." (*Id.*) He did so, Plaintiffs allege, for one of two reasons: First, Plaintiffs posit that Jansma had no real belief that Elian was connected to the Halloween shooting, but sought to arrest him "on a hunch" that Elian's older brother—Eric J. Raya, who does reside at 228 South Comstock—"might be connected to the Halloween shooting because Jansma suspected Raya might be affiliated with a local gang." (*Id.* (alteration removed).) Thus, Plaintiffs contend, Jansma "falsely told the Will County Sheriff's Office and/or Sgt. Paul Rojek that the building at 226 and 228 S. Comstock was a single-family home, hoping that the warrant would be executed at both residences and yield evidence connecting either Elian or Eric (or any other resident) to the Halloween Party Shooting." (*Id.* ¶ 39 (alteration removed).) Plaintiffs' alternative theory is that Jansma believed the Halloween shooting may have been connected to some "drug-deal-gone-awry" and was hoping that officers would enter and secure both 226 and 228 and find drug evidence in either or both homes. (*Id.* ¶ 40.)

Whatever their reason for obtaining or executing the warrant, Plaintiffs allege that the officers "unlawfully forced entry to 228 South Comstock without a warrant, consent, or any exigency." (*Id.* ¶ 5). Upon entry, Defendants "pointed guns directly at Plaintiffs" while they were in their pajamas, "including 10-[,] 12[-], 13-, 14-, and 16-year-old children, at point blank range even though Plaintiffs visibly were unarmed, nonthreatening, nonresistant, and fully compliant." (*Id.* ¶¶ 5, 58.) The officers conducted an unwarranted search of the unit, "pulling clothes out of drawers[] and cutting open couch cushions." (*Id.* ¶¶ 5, 60.) Plaintiffs assert that the Defendants who entered 228 South Comstock knew from the start that they were entering the wrong residence, and "to the extent any did not, they quickly realized their mistake." (*Id.* ¶ 71.) Plaintiffs heard "multiple officers on the scene telling one another, 'This is bullshit. We should've never been here [referencing 228 South Comstock.] This is a family home with kids.'" (*Id.*) While the search was ongoing, several other Defendant officers entered 226 South Comstock from the rear

door. (*Id.* ¶ 64.) Using a shield as he entered, Defendant Sgt. Paul Rojek, "forcibly push[ed] Plaintiff Marianna C. Perez into a wall" while "shouting verbal threats at her." (*Id.* ¶ 65.) Once the officers told her they had a warrant for Elian's address, she immediately led them to the basement where Elian's bedroom was located. (*Id.* ¶ 66.)

The officers surrounded the building around 6:25 a.m. (*Id.* ¶ 5.) By 6:50 a.m., they had "seized all of the Plaintiffs who were in 228 South Comstock and brought them into 226 South Comstock . . . where they detained them in the front living/dining room as they then sought to arrest Elian." (*Id.*) Officers found and arrested Elian in the basement of 226 South Comstock, and he was promptly escorted from the residence.[3] (*Id.*) Yet even after achieving the ostensible goal of the arrest warrant, Defendant officers continued to detain all Plaintiffs—both those who lived in 226 and 228—in the "226 living/dining room," for nearly six hours. (*Id.* ¶ 6.) This extended detention was purportedly justified by Defendants' having found a gun lying on the floor beside Elian when they arrested him.[4] (*Id.*) (Whether this justification was presented at the time Plaintiffs were being detained is not clear from the complaint.) Defendants told Plaintiffs that they were being detained while Defendants worked to get a search warrant to search the entire home. (*Id.*) But Defendants did not immediately seek a search warrant. (*Id.* ¶ 7.) Instead, several of the Defendants transported Elian to the Joliet police station where they "proceeded to interrogate him for over an hour." (*Id.*) It was not until Elian invoked his Fifth Amendment rights and stopped talking that officers actually took steps to obtain a search warrant. (*Id.*) In the meantime, back at

[3] The court expresses some confusion regarding Plaintiffs' recounting of the facts here. According to Plaintiffs, residents of 228 were detained and escorted into 226 at around 6:50 a.m. "as [the officers] sought to arrest Elian." (SAC. [149] ¶ 5.) In the same paragraph of the complaint, Plaintiffs state that Elian was arrested and escorted out of the residence 10 minutes earlier, "by about 6:40 a.m." It is unclear whether the 228 Plaintiffs were escorted into 226 after Elian had been arrested, or if this confusion is simply the result of a typographical error by Plaintiffs.

[4] Plaintiffs express suspicion as to the gun's origins: They state that "[t]here is no doubt the gun was there, but it is unclear how it got there, particularly given that subsequent testing found no fingerprints on it—let alone Elian's." (*Id.*)

226 South Comstock, "Plaintiffs sat imprisoned in the living room of 226 South Comstock under the constant watch of gun-wielding JPD officers who refused their every reasonable request (e.g., to get Ms. Carrasco's asthma inhaler from 228, to put on clothes, to use the bathroom, etc.)." (*Id.*) Jansma returned to 226 South Comstock "[w]ith a search warrant finally in hand" at around 11:45 a.m. (*Id.*) Joliet Police Officers executed the warrant "but found nothing."[5] (*Id.*) Plaintiffs were finally released from the 226 living/dining room around 1:00 p.m. (*Id.* ¶ 8.) Ultimately, three individuals, presumably unrelated to Plaintiffs here, were arrested and charged with the Halloween shooting murders. (*Id.* ¶ 9.)

**B. Defendants Attempt to Cover Up**

Plaintiff alleges that several Defendants attempted to cover up their wrongful entry into 228 South Comstock, rather than 226. (*Id.* ¶ 71.) Recounting the events of that day, Jansma completed a report dated November 2, 2021 in which he described 226 and 228 as a single residence, referring repeatedly to the two separate units as "the residence." (*Id.* ¶ 73.) Jansma wrote in the report that he had "on previous occasions been inside 226 and 228 Comstock Street," but this was, according to Plaintiffs, untrue. (*Id.* ¶ 74.) Plaintiffs assert that Jansma was lying in the report to lend credibility to his account, and that he had actually never been inside the residence prior to that day.[6]

Moreover, Jansma wrote that "officers approached 228 Comstock Street and knocked on the front door. [Plaintiff Adela J. Carrasco] . . . opened the door and allowed the officers to walk inside the residence to check the residence for Elian Raya," seeking, according to Plaintiffs, to "create the false impression that Ms. Carrasco [had] somehow voluntarily consented to Defendants' forced entry at gunpoint." (*Id.* ¶ 75 (alteration removed).) Plaintiffs also allege that

---

[5] It is unclear from Plaintiffs' complaint whether the JPD officers who executed the search warrant are also named as Defendants in this case.

[6] The court notes that, had Jansma previously been inside the units, this fact might well *support* Plaintiffs' assertion that Jansma knew perfectly well that there were two separate units in the building and that he was in the wrong one.

Jansma and another JPD Defendant, Officer Marcus Wietting, omitted key facts from their reports recounting the incident, including that officers conducted a search of 228 South Comstock without a warrant and detained Plaintiffs inside 226 South Comstock for nearly six hours. (*Id.* ¶ 76–78.)

### C. Traumatic Impact on Plaintiffs

The events of that day were traumatic for Plaintiffs, especially for the children. (*Id.* ¶ 10.) Plaintiffs claim that they "still can hear the sound of Defendants shouting at them to 'PUT YOUR FUCKING HANDS UP!' and calling them 'MOTHER FUCKERS!' as they escorted them, at gun point, out of their bedrooms even though they had done nothing wrong, were nonthreatening, and were at all times compliant." (*Id.*) Plaintiffs have had nightmares about the six-hour detention inside 226 South Comstock, and one or more of the Plaintiffs have developed Post-Traumatic Stress Disorder as a result of Defendants' misconduct. (*Id.* ¶¶ 10, 100.)

### D. The Parties

The parties on both sides of the "v." are numerous. (*Id.* ¶¶ 15–27.) Plaintiffs are fourteen residents of 226 South Comstock and 228 South Comstock, including the minor children.[7] (*Id.* ¶¶ 15–16.)

Defendants A. Adams, Lawrence Brooks, Michael Cagle, Flor Del Rio, Philip Emph, Michael Georgantas, Raymond Jansma, Patrick Kelly, Tizoc Landeros, Bradley McKeon, Sgt. Moore, Rachel Smithberg, Richard Stygar, and Marcus Wietting (collectively, the "JPD Defendants") are current or former officers and employees of the Joliet Police Department and the City of Joliet. (*Id.* ¶ 17.) Plaintiff alleges these officers were acting under color of state law during the events in question. (*Id.*¶ 18.) Plaintiffs also name the City of Joliet as a defendant, asserting that the City is vicariously liable for all torts committed by the JPD Defendants. (*Id.* ¶ 19.)

Defendants Russ Burroughs, Michael Janovyak, Paul Rojek, and Todd Wittmayer (collectively, the "WCSO Defendants") are current or former officers and employees of the Will

---

[7] Eric Raya, but not his brother Elian, is a Plaintiff as well.

County Sheriff's Office and/or the County of Will. (*Id.* ¶ 20.) WCSO officers can also be deputized as members of the Great Lakes Regional Fugitive Task force, a federal taskforce that "combines the efforts of federal, state, and local law enforcement agencies to locate and apprehend dangerous fugitives." (Mem. [157] at 7 (citing https://www.usmarshals.gov/what-we-do/fugitiveinvestigations/fugitive-task-forces).) Even if they were deputized as part of a federal task force on November 2, Plaintiffs contend, the WCSO defendants were acting under the color of state law. (SAC [149] ¶ 21.) Plaintiffs allege in the alternative that Defendants were acting under color of federal law. (*Id.*) They allege, further, that the Will County Sheriff's Office and the County of Will are vicariously liable for all torts committed by the WCSO Defendants. (Id. ¶ 22.)

Defendants Dominic DiLuigi and Justin McCloud (collectively, the "USMS Defendants") were, at the time of the events in question, agents of the United States Marshals Service who were, Plaintiffs allege, acting under color of state law, or in the alternative under color of federal law. (*Id.* ¶ 24.)

Defendants Aldo Alba, Dave Hakim, Mike Harrington, Paul McGinn, Eric Powe, Zack Schmitt, Eric Sledge, and Chris Struhart are current or former deputies and employees of the Kane County Sheriff's Office, DuPage County Sheriff's Office, Illinois Department of Corrections, U.S. Department of Health and Human Services, U.S. Immigration and Customs Enforcement, Kendall County Sheriff's Office, Illinois Attorney General's Office, and U.S. Immigration and Customs Enforcement, respectively. (*Id.* ¶ 25.) These officers were members of the Great Lakes Regional Fugitive Task Force, (*id.*); whether the November 2, 2021 raid was a Task Force Operation is disputed, but the court here refers to these officers collectively as the "Task Force Defendants." Plaintiffs assert that the Task Force Defendants were acting under color of state law, or in the alternative under color of federal law. (*Id.*)

All Defendants are sued only in their individual capacities. (*Id.* ¶ 26.) The Taskforce, USMS, and WCSO Defendants have brought this motion to dismiss.[8]

**E. Color of Law**

Whether Plaintiffs can proceed against the moving Defendants turns on whether these Defendants were acting under color of federal law; if so, Plaintiffs have no recourse under § 1983. Plaintiffs rely on a "nonexhaustive" list of facts alleged in the Second Amended Complaint that they believe reflect the "state/local character of the investigation and operation" and confirm that these Defendants were acting under the color of state law. (SAC [149] ¶ 83.)

First, Plaintiffs note, all Defendants—including the Moving Defendants—were participating in an investigation that was led, controlled, and supervised by state/local actors, including JPD Defendant Jansma and Will County Sheriff's Office ("WCSO") Defendants Rojek and Wittmayer. (*Id.* ¶¶ 84, 85.) For example, Defendants executing the initial arrest warrant made a call to Jansma "mere seconds prior to forcing entry to 228 Comstock, requesting confirmation as to where Jansma wanted the warrant to be executed." (*Id.* ¶ 87.) Further, WCSO Defendants and Task Force Defendants sought direction and information from JPD Defendant Jansma regarding the investigation and operation. (*Id.* ¶ 83h.)

Plaintiffs assert, further, that the state/local character of the operation is demonstrated by representations made by the Defendants themselves. (*Id.* ¶ 83.) For example, Will County Officer Wittmayer submitted "a sworn affidavit several days prior to the warrant execution in which he stated that he was submitting the application 'on behalf of the Will County Sheriff's Department.'"[9]

[8] This group of Defendants refer to themselves as the "Federal Defendants" throughout the briefing on the motion to dismiss. (*See, e.g.*, Mem. [157] at 1.) Because the central question before the court on this motion is whether these Defendants were acting under the color of state or federal law, the court declines to adopt this nomenclature. The court will instead refer to this group of defendants as "Moving Defendants" or "Movants" throughout the course of its opinion. Later in this ruling, the court distinguishes federal officer Defendants from the other Moving Defendants.

[9] Plaintiff's allegation here is perplexing, given that they separately allege the warrant that Defendants executed on November 2, 2021 was filed by Defendant Jansma months earlier, not by Defendant Wittmayer and not just "several days prior" to the November 2 raid.

(*Id.* ¶ 83a.) Wittmayer signed this warrant "Deputy Todd Wittmayer #2112," referencing what Plaintiffs believe to be his Will County badge number. (*Id.*) WCSO Defendant Rojek signed his email correspondence related to the investigation here as a member of the "Will County Sheriff's Police," without any reference to the Great Lakes Regional Fugitive Task Force. (*Id.* ¶ 83e.) Moreover, the WCSO Defendants and Task Force Defendants from other counties consistently communicated on their state/local email accounts. (*Id.* ¶ 83h.)

Plaintiffs also allege that on November 2, 2021, "nearly all" Defendants were wearing law enforcement clothing with state/local insignia, were carrying weapons that were "issued (or otherwise approved for use) by state/local law enforcement," were using state/local-issued equipment, and were carrying state/local badges at the time of the incident. (*Id.* ¶¶ 90-93.) They were executing an arrest warrant issued by a state-court judge for state-law crimes, and the warrant made no mention of federal offenses. (*Id.* ¶ 88.) Moreover, "nearly all" Defendants were paid by state/local governmental agencies for their participation in the operation at issue. (*Id* ¶ 89.) For example, Defendant Hakim, a Taskforce Defendant and employee of the DuPage County Sheriff's Office, "did not seek any reimbursement from the federal government in connection with his participation in the execution of the arrest warrant in this case," though he did seek overtime compensation from the federal government for unrelated law enforcement activities he participated in later that day. (*Id.*)

Five of the Defendants are federal officers, but, Plaintiffs allege, they played a *de minimis* role, simply providing support for a state operation. (*Id.* ¶ 94.) Plaintiffs finally allege that "to the extent that any state/local officer was acting as a deputized member of the Great Lakes Regional Fugitive Task Force . . . the Memorandum of Understanding [("MOU")] between [the] Defendant's

---

(SAC ¶ 34.) The court notes this possible inconsistency in Plaintiffs' complaint and instructs Plaintiffs to clarify this inconsistency in an amended complaint if they choose to file one. In any event, whether Jansma or Wittmayer applied for the executed warrant, Plaintiffs point to both of these facts to support their allegations that the raid was a state/local operation, as both these Defendants are state/local officers, not federal, and Plaintiffs' allegations plausibly suggest that these officers were not operating with a federal purpose in seeking their warrant(s).

state/local agency and the U.S. Marshals Service did not apply to the operation in this case," (*id.* ¶ 95.); Plaintiffs they cite no specific language in the MOU to support this assertion, though they have presumably seen the MOU.[10] Alternatively, Plaintiffs allege that even if the MOU applied, the MOU itself provided "that the state/local employees must comply with the state/local agency's use of force policy; that the state/local agency retained responsibility for the conduct of its personnel, including their acts and omissions;" and "that state/local employees shall not be considered as the agent of another participating agency." (*Id.* ¶ 96.) Again, it is unclear whether Plaintiffs here are quoting directly from the language of the MOU, or if this language is simply Plaintiffs' own characterization of the MOU.

## II. Procedural Background

Plaintiffs filed suit on November 1, 2023. (*See* Compl. [1].) In April 2024, the United States substituted itself for the USMS and WCSO defendants [49] under the Federal Tort Claims Act, and moved to dismiss Plaintiffs' state-tort law claims under Rule 12(b)(6) for failure to exhaust their administrative remedies [50]. The court granted Defendants' motion "without prejudice to Plaintiffs' filing a new complaint, to be designated as related to [the instant] case," alleging violations of the FTCA. In August 2024, Plaintiffs filed a separate lawsuit, asserting their FTCA claims against any individual Defendants who was acting under color of federal law or as a federal employee on November 2, 2021. *See Carrasco v. United States*, No. 24 C 7404 [hereinafter "*Carrasco II*"], at Dkt. 1.

Some months later, on January 21, 2025, Plaintiffs filed an amended complaint naming eight additional officers—Alba, Hakim, Harrington, McGinn, Powe, Schmitt, Sledge, and Struhart. (Am. Compl. [81]; Pl.'s Resp. [174] at 8.) Therein, Plaintiffs again raised the state law tort claims

---

[10] Movants fault Plaintiffs for relying on this conclusory allegation to support their claims. (Reply [175] at 10.) This allegation might be insufficient on its own, but as discussed in more detail below, Plaintiffs have alleged additional facts to support their argument that the officers were acting under color of state law—including that the operation was led and orchestrated by state/local police officers for a state/local investigation.

against WCSO Defendants who were not "acting as [] deputized member[s] of the Great Lakes Regional Task Force." (Am. Compl. [81] ¶ 135.)

On April 18, 2025, the WCSO Defendants and the USMS Defendants answered Plaintiffs' amended complaint and asserted as a defense that "Plaintiffs' allegations fail to state a claim under the Supreme Court's current jurisprudence regarding *Bivens*." (Answer to Am. Compl. [121] at 5.) Some months later, on July 18, 2025, the USMS, WCSO, and Task Force Defendants filed a motion for judgment on the pleadings, arguing that *Bivens* is unavailable to Plaintiffs [138]. In their response, Plaintiffs argued that dismissal of the *Bivens* claim is premature, but also asked leave to amend their complaint to support their allegations that the USMS, WCSO, and Taskforce Defendants were acting under color of state law, and not federal law. (Pls.' Resp to Mot. for J. on the Pleadings [145] at 6–9.) The motion was unopposed, and on September 5, 2025, Plaintiffs filed their Second Amended (and now-operative) Complaint [149]. Defendants moved to dismiss [156], and the motion is now fully briefed.

Plaintiffs bring five claims under 42 U.S.C. § 1983 for Unlawful Entry and Search (Count I), Excessive Force (Count II), Unlawful Seizure/False Arrest (Count III), Conspiracy (Count IV), and Failure to Intervene (Count V). (SAC [149] at 28–32.) They also bring Counts I–V as *Bivens* claims (Count VI),"[t]o the extent that any WCSO Defendant, USMS Defendant, or Task Force Defendant committed the misconduct described herein under color of federal law rather than state law." (SAC [149] ¶¶ 132–33.) In addition to these § 1983 claims, Plaintiffs have alleged various state law tort claims against officers who were acting under color of state law. Against officers acting under color of federal law or federal employees, Plaintiffs have asserted claims under the Federal Tort Claims Act in a separate lawsuit. *See Carrasco et al vs. United States of America*, No. 24-cv-7404.

Plaintiffs' state law claims include (a) the claims of Plaintiffs J.F., L.O, and S.O—the children residing in 228 South Comstock—for trespass/failure-to-retreat against individual Defendants who "forcibly entered and/or searched 228 on November 2, 2021 without lawful

authorization to enter upon the premises and/or who failed to immediately retreat once inside" (Count VII); (b) claims of Benjamin M. Onate, J.C., L.F., and J.R. against Defendants who, after arresting and removing Elian from 226 South Comstock, "forcibly remained present inside 226 Comstock without lawful authorization for more than six hours and/or failed to immediately retreat from said premises" (Count VII); and (c) claims of the minor Plaintiffs from both 226 and 228 for Assault (Count VIII), Battery (Count IX), Intentional Infliction of Emotional Distress (Count X), False Arrest (Count XI), and Civil Conspiracy (Count XII).

Finally, Plaintiffs allege that the City of Joliet and the Will County Sheriff's Office are liable under a theory of *respondeat superior* for the violations committed by their employees (Count XIII). They also allege that these Defendants are responsible for indemnifying their employees against any tort award of compensatory damages under 745 ILCS 10/9-102. (Count XIV.)

**LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. FED. R. CIV. P. 12(b)(6); *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive, a complaint must "state a claim to relief that is plausible on its face." *Flores v. City of S. Bend*, 997 F.3d 725, 728–29 (7th Cir. 2021) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is considered plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. "[D]etailed factual allegations" are not required, but "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Still, the court must "accept[] as true all well-pleaded facts and draw[] all reasonable inferences in favor of the non-moving party." *Tobey v. Chibucos*, 890 F.3d 634, 645 (7th Cir. 2018).

## DISCUSSION

### I. Successive 12(b)(6) Motion

Plaintiffs argue, first, that Defendants have raised new arguments that they could have raised in two earlier 12(b)(6) motions (aimed at earlier complaints), and for that reason, the court should deny the motion on procedural grounds. (Opp'n [174] at 12–13.) They argue that Movants' strategy of not raising *Bivens* challenges in earlier motions to dismiss triggers concerns of "piecemeal litigation." (*Id.* at 13 (quoting *Kramer v. Am. Bank & Tr. Co., N.A.*, No. 11 C 8758, 2014 WL 3638852, at *2 (N.D. Ill. July 23, 2014). For support, Plaintiffs cite to this court's decision in *Plumtree v. City of Naperville*, No. 22 C 6635, 2024 WL 3177890 (N.D. Ill. June 26, 2024), where the court denied a successive 12(b)(6) motion. But *Plumtree* is distinguishable; in that case, the defendant's successive motion raised arguments that the court had already considered and rejected, and plaintiff there had presented "no new issues or theories." 2024 WL 3177890, at *3. Here, in contrast, Movants' 12(b)(6) motion comes after Plaintiffs articulated a new theory: that the Movants acted under color of state law. (*Compare* SAC [149] with Compl. [1] and First Amended Compl. [81].) Plaintiffs' procedural objection to consideration of the motion is overruled.

### II. Section 1983 Claims

#### A. WCSO Defendants

Movants seek to dismiss Plaintiffs' claims against them because § 1983 provides a cause of action only against state or local actors. (Mem. [157] at 23) Movants argue that Plaintiff's own allegations demonstrate that the Moving Defendants were acting under color of *federal*—not state—law because Plaintiff alleges "that a *United States Marshals Service* task force executed an arrest warrant at their home." (*Id.* (citing SAC [149] ¶ 1) (emphasis in original).) This fact alone, Movants argue, is dispositive because "U.S. Marshals task force officers operate under color of federal law when they execute arrest warrants as part of the task force." (*Id.*)

Plaintiffs counter that treating this factor alone is inconsistent with Seventh Circuit authority that calls for consideration of the "totality of the circumstances" in determining whether an

officer—even one who may have been a member of a federal task force—was acting under color of state or federal law. (Opp'n [157] at 15 (citing *Askew v. Bloemker*, 548 F.2d 673 (7th Cir. 1976); *Aska v. Yingling*, No. 23-cv-50004, 2025 WL 1866305, at *4 (N.D. Ill. July 7, 2025) (Johnston, J.)) The cases they cite for this argument focus on the reverse side of this question: Whether state officers joining in a federal task force operation are acting under color of federal law, and thus shielded from § 1983 liability. Thus, in *Askew v. Bloemker*, 548 F.2d 673, 677 (7th Cir. 1976), decided decades ago, the Seventh Circuit affirmed summary judgment in favor of defendants based on the "totality of the circumstances", including the fact that the raid challenged in that case "resulted from a federal investigation, whose purpose was to arrest persons suspected of federal law violations," and that "the named defendants' activities were clearly directed by and subject to the immediate control of [federal] supervisors." *Id.*

The reasoning in *Askew* has been applied in the decades since. In *Amoakohene v. Bobko*, 792 F. Supp. 605, 607–08 (N.D. Ill. 1992), a judge of this court relied on *Askew* in finding that Chicago Police officers who operated within a DEA task force and "under the direct supervision and control of DEA supervisory personnel" could not be held liable under § 1983. *Id.* In *Lee v. Village of Glen Ellyn*, No. 16-CV-7170, 2017 WL 2080422 (N.D. Ill. May 15, 2017), the district judge dismissed a complaint filed by a plaintiff who "ha[d] no basis to contend that 'DEA Task Force' officers were acting pursuant to state law when carrying out their federal DEA task force functions beyond his allegation that they were not permanent federal employees." *Id.* at *4.[11] And

[11] Further, the Ninth Circuit recently adopted *Askew*'s reasoning in *Thai v. Cnty. of Los Angeles*, 127 F.4th 1254, 1260 (9th Cir. 2025). *Cert. denied sub nom. Thai v. Los Angeles Cnty., California*, 146 S. Ct. 299, 223 L. Ed. 2d 124 (2025). There, the Ninth Circuit affirmed the district court's holding that two Los Angeles District Attorney's office investigators who were "temporarily assigned to work full time in a joint federal-state program," investigating allegations of fraud in Social Security disability benefits applications, were acting under color of federal law, rather than state law. (*Id.* at 1256) Citing *Askew*, the court found that "[i]n general, where the source of authority for the program is federal in nature and the state officials' participation in the challenged conduct is subject to the immediate control of a federal supervisor, those officials act under color of federal law, not under color of state law." *Id.* at 1260. Because the MOU between the federal and state agencies there stated that "the legal authority for the agreement" was a federal statute, and because "the individual supervising the officers and the daily operations of

in *Redmond v. City of Rockford*, No. 22-CV-50040, 2024 WL 4953825 (N.D. Ill. Dec. 2, 2024), the court outlined "common factors" emerging from *Askew* and "the litany of cases that followed it" that help "courts determine when an official's federal hat replaces her state one." *Id.* at *3.

> Courts will consider whether a cross-deputization agreement exists between her state employer and the federal agency. They'll also assess whether the officers "participated in a clearly federal investigation or in a federally instigated raid," and whether the officers were subject to federal control. Other factors include compensation structure and whether officers wore federal or state insignia. No factor in isolation is dispositive.

*Id.* (internal citations omitted). In *Redmond,* the court found that local police officers acting as part of a DEA Task Force were acting under color of federal law where "Rockford and the DEA executed a formal task force agreement" under a federal statute, "[t]he DEA deputized [the local officer] as a sworn federal agent, and [the local officer] carried a federal badge," the local officer "acted under the direct supervision and control of DEA supervisory personnel," and "[t]hough Rockford Police paid [the local officer's] salary, it could seek reimbursement from the DEA for overtime activities." *Id* (internal quotations omitted).

*Askew*, *Amoakohene*, *Redmond*, and *Thai* all concluded that local officers involved in a federal task force operation were acting under color of federal law. In at least one more recent case, *Aska*, the court applied the rationale of those cases in circumstances that led to the opposite conclusion: *Aska* held that a reasonable jury could find that local officers who are part of a federal task force were acting under color of state law in effectuating an arrest. 2025 WL 1866305, at *3. In that case, the Illinois Department of Corrections had issued an arrest warrant in November 2021 for a parole violation, and assigned the case to Officer Montemayer, an IDOC Fugitive Apprehension agent who was deputized by the Great Lakes Regional Fugitive Task Force—the same federal task force relevant here. 2025 WL 1866305, at *1–2. Montemayer referred the case to the Task Force later that month, and the Task Force took on the case, assigning it "a federal ID number." *Id.* at *3. Although Task Force officers confirmed their target's location in

---

the [program] [was] a federal agent," the officer's conduct arose under federal law, rendering remedies under § 1983 unavailable. *Id.* at 1261.

December 2021, there was "no formal arrest operation" until January 2022, when the IDOC's Chief of Parole received intelligence that the target of the initial warrant might be bringing drugs into an IDOC facility. *Id.* In response, the IDOC Chief—unaware that the Task Force had adopted the case—told Montemayer to apprehend the suspect. Montemayer then "texted other team members, including . . . other Task Force members, for help with the arrest." *Id.* In light of these facts, the court held that defendants had "too quickly assume[d] [a] predicate fact, summarily concluding that officers aimed to arrest a fugitive not an IDOC suspect." *Id.* at *5.

Movants here argue that, based on Plaintiffs' allegations, Defendants "[un]ambiguous[ly]" participated in a federal operation. (Reply [175] at 8–9.) They contend this case differs from *Aska* in that the defendant officers in that case "had been *instructed by their boss at the IDOC* to apprehend the suspect to prevent him from bringing drugs into an IDOC facility, creating a fact question about whether the officers acted with a 'federal' or 'state' purpose." (Reply [175] at 10–11 (emphasis in original).) Conversely here, they contend, "[P]laintiffs have simply alleged that officers Rojek and Wittmayer—who worked for Will County—were the task force operation's leaders." (*Id.* at 11.)

In the court's view, that argument relies on a somewhat cramped reading of Plaintiffs' allegations.[12] Plaintiffs have alleged that nearly all officers identified themselves not as affiliated with a federal task force, but as state/local officials—in their communications with one another, in the badges they carried, and in the insignia they donned on their uniforms. (SAC [149] ¶¶ 83–87.) Further, Plaintiffs have alleged that the arrest was led by a Joliet Police Officer, Defendant Jansma, who executed the warrant in order to seek information for a crime that his local police department was investigating. (*Id.* ¶¶ 84, 85.) On these facts, it does not appear that the raid

[12] The *Aska* court had the benefit of a summary judgment record. That this court is considering a pleading motion bolsters the conclusion that dismissal is inappropriate: color of law questions turn on a myriad of factual determinations that are better laid out and considered in post-discovery motions. *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982) (describing the color-of-state-law inquiry as "necessarily fact-bound"). Because Plaintiffs have sufficiently alleged that the Task Force officers were acting under color of state law, dismissal is inappropriate.

was "federally instigated," but instead that it was instigated, led, and directed by Jansma, Rojek, and Wittmayer—all state or local officers. *See Aska*, 2025 WL 1866305, at *4. Rojek and Wittmayer are members of the Task Force, but it is not clear from the allegations of the Complaint that these officers were participating in a Task Force *operation*. Taking Plaintiffs' allegations as true, the officers' actions here had a state/local purpose. These facts, in tandem with officers' representations that they were state/local officers, "cast an indelibly [state] hue upon the activities of the[] [officer]." *Askew*, 548 F.2d at 677.

Movants contend that "there is simply no plausible explanation . . . for a group of officers from as disparate a group of agencies as the DuPage County Sheriff's Office, the Kane County Sheriff's Office, the Kendall County Sheriff's Office, the Will County Sheriff's Office, the Illinois Department of Corrections, the Illinois Attorney General's Office, the Department of Homeland Security, and the U.S. Marshals Service . . . to come together to act under anything but federal law." (Reply [175] at 8 (alteration omitted).) In short, they ask: why else would these Defendants work together? The court presumes it is not unusual for law enforcement officers to assist one another across department or government lines. Perhaps Elian Reya was suspected to be involved in activity that implicates federal criminal statutes. Whether or not these things are true, the facts in *Aska* show that the mere convergence of officers from a diversity of state and federal agencies is not sufficient to render an operation unambiguously federal. *See Aska*, 2025 WL 1866305, at *4. Plaintiff's claim that all of the officers were acting under color of state law survives this motion, and the motion to dismiss the WCSO Defendants Russ Burroughs, Michael Janovyak, Paul Rojek, and Todd Wittmayer is denied.

Plaintiffs allege in the alternative that the WCSO Defendants were acting under color of federal law, presumably to preserve a possible remedy under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971). Because they have plausibly alleged that these officers acted under color of state law, and not federal law, the court need not, for now, address the

applicability of *Bivens*. Defendants are welcome to challenge *Bivens'*s applicability to the WCSO Defendants again at summary judgment.

### B. Task Force Defendants from Other Counties

Movants also ask the court to dismiss claims against Task Force Defendants from other counties and all federal officer Defendants. With respect to state/local Task Force defendants employed by other counties—Alba (Kane County), Hakim (DuPage County), and Schmitt (Kendall County)—they assert that these officers "could not plausibly have acted under color of state law at plaintiffs' Will County home." (Reply [175] at 11.) They note that in *Askew*, the Seventh Circuit affirmed a finding that a state officer who had been deputized to assist in the raid at issue there "could not have acted under color of state law" because the location of the raid "was outside his jurisdiction as a St. Louis police officer." *Askew*, 548 F.2d 673 at 677. But this was one of a myriad of factors the court considered in determining this state officer acted under color of federal law, including that the raid had been instigated by federal officers and that the officer's activity was "directed by and subject to the immediate control of" federal agents. *Id.* Moreover, the state officers in *Askew* were deployed from a different state, not just a different county within the same state, for the purposes of the raid in question there. *Id.* This case differs in that Kane County, DuPage County, and Kendall County are all counties within the State of Illinois.

Several courts have held that officers acting outside of their jurisdiction may be deemed to be acting under state law, especially where their actions took place in the same state where they are employed. *See, e.g., Carr v. Mendrick*, No. 21-CV-6301, 2023 WL 3123291, at *4 (N.D. Ill. Apr. 27, 2023) ("In contrast [to the state officer in *Askew*], Beebe's actions took place in the same state where he is employed. Actions taken by Beebe outside of DuPage County, but still within Illinois, can be under color of state law." (internal citations omitted)); *Davis v. Kirby*, 755 F. Supp. 199, 203 (N.D. Ill. 1990) (distinguishing *Askew* on the same basis). In light of this caselaw, Movants' implication that this geographic element on its own is sufficient to bring these officers' actions under the color of federal law is unconvincing. Moreover, Movants' apparent contention

that the protections of § 1983—a law enacted in the Reconstruction Era to prevent civil rights abuses by state officials—cease at county borders is at odds with the remedial purpose behind that statute.

Plaintiffs' claims can similarly proceed against the Task Force Defendants employed by counties outside of Will County. Similarly to the WCSO Defendants, Plaintiffs again allege in the alternative that the state/local officer Task Force Defendants acted under color of federal law. Because the court finds that Plaintiffs have plausibly alleged these Defendants acted under color of state law, it need not address the applicability of *Bivens* to these Defendants actions at this time. Again, Defendants are welcome to raise this issue in their summary judgment briefing.

**C. Federal Officers**

That leaves the question of what theory of liability may be available against federal officer defendants—i.e., the USMS Defendants, McGinn, Powe, and Struhart. *Bivens* provides a narrow remedy for constitutional violations committed by federal officers acting under color of federal law, but federal officers may be held liable under § 1983 if they engaged in a conspiracy with state officers to deprive a plaintiff of his or her constitutional rights. Thus, a § 1983 remedy may be available against federal employees, as against private individuals, if they conspire or act in concert with state officials to deprive a person of their civil rights under color of state law. *See Case v. Milewski*, 327 F.3d 564, 567 (7th Cir. 2003). However, "[v]ague and conclusory allegations of the existence of a conspiracy are not enough to . . . survive a motion to dismiss." *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). "'[B]are assertions' and 'conclusory' allegations that the officials conspired with each other fail[] to state a claim." *Maus v. Lade,* No. 22-2085, 2023 WL 334792, at *2 (7th Cir. Jan. 20, 2023).

Movants contend that Plaintiffs have not adequately alleged a conspiracy between the JPD Defendants and the so-called "federal defendants" at all—apparently a reference to the whole group of WCSO Defendants, USMS Defendants, and Task Force Defendants. (Mot. to Dismiss [157] at 26.) As the court reads their allegations, however, Plaintiffs have sufficiently

alleged that some conspiracy existed to deprive Plaintiffs of their constitutional rights: they allege, for example, that the defendants entering the front of 228 South Comstock knew that they were entering a unit not listed on the warrant when they first entered (Compl. [1] ¶ 69), and that a group of defendants collectively detained Plaintiffs for more than 6 hours—denying their requests to use the bathroom, for their medication, and to put on less revealing clothing than their pajamas—with a rotating group of defendants constantly standing watch of Plaintiffs while wielding guns (*id.* ¶¶ 7, 68). *See Hudgins v. Bd. of Educ. of City of Chicago*, No. 23 C 218, 2023 WL 4303004, at *10 (N.D. Ill. June 30, 2023) (finding plaintiff sufficiently alleged a § 1983 conspiracy claim against a private actor who "knew or should have known that they would be violating" plaintiff's constitutional rights and "worked collaboratively" with a state actor in establishing the rights-violating program).

To impose § 1983 liability on the federal officer defendants, Plaintiffs must establish those federal officers' personal involvement in the conspiracy. *See Economan v. Cockrell*, No. 1:20-CV-32, 2020 WL 6874134, at *20 (N.D. Ind. Nov. 23, 2020) (describing the law around whether § 1983 liability could attach to federal officer defendants as "unsettled," but finding that plaintiffs had stated viable § 1983 claims against such defendants "based on their alleged actions and conduct in concert with state officers in state proceedings."). The problem here is that Plaintiffs have not described the specific conduct of the five federal officer Defendants—DiLuigi, McCloud, McGinn, Powe, and Struhart—or explained how their actions contributed to the alleged conspiracy. The court recognizes that some "group pleading" may be necessary in a case such as this one, where information regarding which Defendants took part in the various phases of the alleged constitutional violations is more readily available to Defendants, and almost certainly will be clarified in discovery. *Hounen Solar, Inc. v. UL LLC*, No. 22 CV 03240, 2025 WL 3093720, at *3 (N.D. Ill. June 26, 2025) (Tharp, J.) ("[A] Complaint does not fail for so-called 'group pleading' where it would be unreasonable to expect more specific allegations until the parties have conducted discovery and the Complaint refers adequately to specific Defendants or subgroups of

Defendants when possible, and includes enough factual content to give those Defendants fair notice of the claims against them." (cleaned up and internal quotations omitted)). The complaint, as written, makes it difficult for Defendants to understand the wrongdoing that they are accused of, or for the court to analyze the plausibility of the conspiracy allegations in the complaint—but the parties in this case have been actively engaged in discovery throughout the pendency of the litigation and the filing of amended pleadings. By now, Plaintiffs have likely obtained information regarding the specific conduct of each of the named Defendants.

The court grants the motion to dismiss as to these federal officers and grants Plaintiffs leave to file an Amended Complaint with an eye towards specificity regarding the involvement of the five federal officer defendants.[13] If Plaintiffs cannot identify the specific acts of each federal officer—or if the facts in the complaint otherwise do not plausibly allege that a conspiracy existed—Defendants may renew their motion to dismiss.

Turning now to Plaintiffs' remaining allegations against the federal officer Defendants: Without a plausible allegation of conspiracy, the court will assume—for the purposes of this ruling—that these federal officer Defendants acted under color of federal law. If so, Plaintiffs will have to rely on *Bivens* to hold these federal defendants liable, but this poses challenges. Even if Plaintiffs had plausibly alleged that these Defendants participated in a conspiracy to deprive Plaintiffs of their constitutional rights, a conspiracy claim "presents a new context to which *Bivens* does not apply." *Jackson v. Wray*, 2023 U.S. Dist. LEXIS 193206, *8 (N.D. Tex. Sept. 27, 2023)

[13] Movants argue separately that, because Plaintiffs allege these five federal officers played a *de minimis* role in the operation, Plaintiffs cannot allege the requisite personal involvement as to these Defendants to sustain a colorable § 1983 claim. (Mem. [157] at 28–29.) The court disagrees. Plaintiffs' allegations regarding the minimal proportional role played by these defendants in this otherwise massive operation shed little light on the question of whether the federal officer defendants were personally involved in the violations alleged. And Plaintiffs' allegation that these federal officers played a limited role makes sense considering their contentions that the operation was led, directed, and supervised by state officers. Movants are correct that Plaintiffs' Second Amended Complaint does not adequately allege personal involvement by these officers—Plaintiffs' complaint is ambiguous as to their roles in the operation—but Plaintiffs are free to attempt to flesh out the relevant details in an amended complaint.

(collecting cases); *see also Cargill v. Peters*, No. 4:24-CV-344-AW-MJF, 2025 WL 1538804, at *4 (N.D. Fla. Mar. 28, 2025) (conspiracy claim arises in "new context").[14] Without factual details regarding the nature of these specific officers' conduct during the events at issue, it is not clear that Plaintiffs can allege a basis for a *Bivens* claim. Because such details may become clarified over the course of discovery (which is already underway), the court will grant leave for Plaintiffs to submit an amended complaint, but cautions that *Bivens* is very narrowly confined, and Plaintiffs will face recognized challenges in this effort.

Plaintiffs' claims against Defendants DiLuigi, McCloud, McGinn, Powe, and Struhart are dismissed without prejudice.

## III. State Law Tort Claims

Defendants argue that Plaintiffs' state law tort claims brought against the WCSO Defendants and the state-officer-Task Force Defendants are duplicative of FTCA claims brought in their related case. (Mot. to Dismiss [157] at 30.) They assert that because the U.S. Attorney General has certified that all 14 Movants "were acting within the scope of their employment as employees of the United States at the time of the incident out of which the claim in this case arose,"[15] the United States has been substituted as the proper defendant for all claims arising from these Defendants' alleged State Tort Violations. And because Plaintiffs themselves allege in their related FTCA case that all Task Force officers were federal employees, Defendants ask the court to dismiss their state tort claims here as duplicative. But Plaintiffs are free to plead alternative legal theories to preserve their claims in the same complaint, and are certainly entitled to do so across different complaints. *See Tibor Mach. Prods., Inc. v. Freudenberg-NOK Gen. P'ship*, 967 F. Supp. 1006, 1013 (N.D. Ill. 1997) ("In the early stages of litigation, a plaintiff is

---

[14] Plaintiffs concede this point in their Response. (Resp. [174] at 23.)

[15] The court notes that the Attorney General's certification does not control the question whether Movants were acting under state or federal *color of law*. The court must answer that questions, as explained earlier, based on the totality of the circumstances of the events themselves.

permitted both to rely on alternative theories of recovery and to incorporate inconsistent facts in separate counts."); *Bertrang v. City of Mondovi*, No. 17-CV-918-BBC, 2018 WL 3978109, at *4 (W.D. Wis. Aug. 20, 2018) ("Under the federal rules, a plaintiff may advance more than one legal theory in support of a single claim, and those alternative theories may, but need not be, set forth in separate counts. This does not mean that plaintiff would be able to recover twice for the same injury.") (internal citations omitted).

Recognizing the possibility of duplicative claims, the court nevertheless declines to dismiss Plaintiffs' state tort law claims against the WCSO Defendants and the state-officer Task Force Defendants at this time. If, upon completion of discovery, it becomes clear that these officers were acting as federal employees, deputized to serve on the Great Lakes Regional Fugitive Task Force, the court will dismiss or grant summary judgment on these claims. If it becomes clear instead that these officers were not participating in a federal operation, Plaintiffs' FTCA claims against the United States arising out of the WCSO and state-officer-Task Force-Defendants' conduct will be dismissed. Finally, because Defendants argue that Plaintiffs' claims are untimely pursuant only to the timeliness requirements outlined by the FTCA, the court is not prepared to dismiss the state tort claims on timeliness grounds either.

**CONCLUSION**

Movants' motion to dismiss [156] is granted without prejudice with respect to Defendants DiLuigi, McCloud, McGinn, Powe, and Struhart and otherwise denied. Plaintiffs are directed to file an Amended Complaint addressing the involvement of the federal officer Defendants within 21 days.

ENTER:

Dated: August 25, 2026

REBECCA R. PALLMEYER
United States District Judge